UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK C. BROWN,

               Plaintiff,                     Civil Action No. 12-14506

        v.                            District Judge Robert H. Cleland
                                      Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

## REPORT AND RECOMMENDATION TO
## GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [11] AND
## DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [15]

      Plaintiff Mark C. Brown appeals Defendant Commissioner of Social Security's denial of his application for social security income. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 11, 15). For the reasons set forth below, this Court finds that substantial evidence does not support the Administrative Law Judge's finding that Brown's impairments were not equal in severity to the Commissioner's listing criteria for spinal disorders. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 11) be granted in part, that Defendant's Motion for Summary Judgment (Dkt. 15) be denied, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REVERSED AND REMANDED.

## I. BACKGROUND

      Plaintiff was 49 years old on the alleged onset date and 51 at the time of the ALJ's decision. (*See* Tr. 97.) He did not complete high school or a GED, but can speak, write, read, and

understand English. (Tr. 16, 107, 112.) Plaintiff last worked in July 2004 as a truck driver. (Tr. 109, 139.) He previously worked as a laborer for a demolition company, a construction company, and a lumber mill. (*Id.*) Brown was injured in 2003 while lifting a heavy pallet at work, and thereafter experienced chronic pain in his neck through his left shoulder and lower back. (Tr. 193.) Brown also had a bad knee, asthma, and depression. (Tr. 20–21.)

### A. Procedural History

On July 18, 2008, Plaintiff protectively filed for supplemental security income, asserting that he became unable to work on June 20, 2008. (Dkt. 8, Administrative Transcript ("Tr.") 75, 97.) The Commissioner initially denied Plaintiff's disability application on December 5, 2008. (Tr. 75.) Plaintiff then requested an administrative hearing, and on July 7, 2010, he appeared with counsel before Administrative Law Judge Jerome B. Blum, who considered his case *de novo*. (Tr. 11.) Although Plaintiff had filed a previous claim that was denied by another ALJ in June 2008 (Tr. 70–74), ALJ Blum found he was not bound by that decision because there was new and material evidence (Tr. 45).[1] Nonetheless, in a January 14, 2011 decision, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (*See* Tr. 55.) The ALJ's decision became the final decision of the Commissioner on August 15, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on October 11, 2012. (Dkt. 1, Compl.)

### B. Medical Evidence

#### 1. Physical Impairments

From September 2006 to March 2010,[2] Dr. Noel H. Upfall treated Brown at least

---

[1] The parties did not raise preclusion in their motions, so the Court does not address the prior decision.

[2] With the possible exception of the six months from May 2008 to January 2009, for which there are no records from Dr. Upfall in the administrative record.

monthly and sometimes weekly for chronic back and neck pain with spasm and tenderness. (*See* Tr. 158–179, 258–76.) Dr. Upfall's examination notes contain little detail, but every examination note states that Brown's musculoskeletal range of motion was good. (*See* Tr. Tr. 158–179, 258–76.)

In February 2007, Dr. Upfall recommended that Brown get an MRI[3] and see a specialist for his back pain. (Tr. 174.) Brown was examined by physiatrist Dr. H. C. Song on March 2, 2007. (Tr. 193–94.) Dr. Song indicated that Brown had full range of motion in all joints, normal muscle tone, and normal motor exam, but some tenderness. (Tr. 193.) He wrote, in a letter to Dr. Upfall, that the etiology of Brown's condition was "not clear," although "he has a job related injury in 2003." (Tr. 194.) On March 23, 2007, upon reviewing Brown's EMG[4] reports from September 2002, Dr. Song diagnosed left cervical radiculopathy[5] and left sacroiliac disorder.[6] (Tr. 192.) Dr. Song suggested steroid injections, but Brown was "reluctant." (*Id.*) Dr. Song ordered two weeks of physical therapy and prescribed Vicodin. (*Id.*)

---

[3] MRI or magnetic resonance imaging is a noninvasive diagnostic procedure that uses a magnetic resonance scanner to produce detailed sectional images of the internal structure of the body. *Random House Dictionary* (2013), http://dictionary.reference.com/browse/mri.

[4] An EMG or electromyogram is a visual and sound record of electric waves associated with activity of skeletal muscle that is used in the diagnosis of neuromuscular disorders. *See Webster's Third New International Dictionary, Unabridged* (2002) [hereinafter *Webster's Dictionary*], http://unabridged.merriam-webster.com/unabridged/emg, http://unabridged.merriam-webster.com/unabridged/electromyograph.

[5] Radiculopathy is "disease of the nerve roots, such as from inflammation or impingement by a tumor or a bony spur." *Dorland's Illustrated Medical Dictionary* (31st ed. 2007). Cervical radiculopathy is "radiculopathy of cervical nerve roots, often with neck or shoulder pain; compression of nerve roots is a common cause in this area." *Id.*

[6] The sacroiliac is the joint between the sacrum and ilium, where the vertebral column joins the pelvis. *Encyclopedia Britannica* (2008), http://dictionary.reference.com/browse/sacroiliac.

Dr. Song saw Brown approximately every four to six weeks from March 2007 through March 2010. (*See* Tr. 180–94, 236–44, 283.) Brown's symptoms remained relatively unchanged during that period; he continued to report ongoing pain, while on examination Dr. Song found some tenderness but normal motor function. (*See id.*) On two occasions, however—October 12, 2007, and October 5, 2009—Dr. Song wrote that Brown "still ha[d] limited motion in the lumbar spine secondary to pain." (Tr. 187, 237.)

Brown underwent an MRI of his lumbar spine on August 17, 2007. (Tr. 290.) The report indicated "facet hypertrophic arthropathy[7] causing foraminal stenosis[8] at L4-L5" and "broad right paracentral disc protrusion[9] at L4-L5 imping the intradural segment of the right L5

---

[7] Facet hypertrophic arthropathy is abnormal enlargement of the facet joints, which are the joints between vertebrae in the spine. *See Random House Dictionary*,
http://dictionary.reference.com/browse/facet joint,
http://dictionary.reference.com/browse/hypertrophic,
http://dictionary.reference.com/browse/arthropathy.

[8] Lumbar spinal stenosis is narrowing of the lumbar spinal canal, which may put pressure on the spinal cord or sciatic nerve roots before their exit from the foramina, the openings in the vertebral column through which spinal nerve roots pass. *See* Merck & Co., Inc., *The Merck Manual Online*,
http://www.merckmanuals.com/professional/musculoskeletal_and_connective_tissue_disorders/neck_and_back_pain/lumbar_spinal_stenosis.html (last modified Mar. 2013),
http://www.merckmanuals.com/professional/neurologic_disorders/peripheral_nervous_system_and_motor_unit_disorders/overview_of_peripheral_nervous_system_disorders.html (last modified Nov. 2012).

[9] The vertebrae in the spine are separated and cushioned by shock-absorbing discs of cartilage. A disc has a tough covering and a soft interior. If a disc is suddenly squeezed by the vertebrae above and below it, as when lifting a heavy object, the covering may tear or rupture, causing pain. The interior of the disc can squeeze through the tear in the covering, so that part of the interior bulges out or herniates. This bulge can compress, irritate, or damage the spinal nerve root next to it, causing more pain. Merck & Co., Inc., *The Merck Manual Home Health Handbook*,
http://www.merckmanuals.com/home/bone_joint_and_muscle_disorders/low_back_and_neck_pain/low_back_pain.html (last modified Mar. 2013). The standard use of the term "protruded

nerve root." (*Id.*) Dr. Song commented after summarizing the report for Dr. Upfall: "However, his symptom is on the left sacroiliac area." (Tr. 188.) Dr. Song reviewed the MRI films and confirmed the report's findings. (Tr. 187.) Dr. Song wrote on February 8, 2008, regarding the MRI: "this disc protrusion may not [be the] cause of his current pain, but he has facet arthropathy, which may be the cause of pain but soft tissue and organ was reported to be normal in MRI. Therefore, I told him that I am not quite sure of the cause of his pain even though most probable cause is from facet arthropathy." (Tr. 184.) Dr. Song's diagnosis in August 2008 was "[c]hronic lower back pain secondary to lumbar disc disease, and degenerative arthritis in the lumbar spine." (Tr. 180.)

Dr. Upfall noted "pain medicine abuse taking Vicod[i]n every 4–6 h[ou]rs" on October 31, 2007, (Tr. 164) and wrote that Brown was "begging for Vicod[i]n that he will not get" on July 17, 2007 (Tr. 172). In May 2008, Dr. Song started Brown on a long-acting opioid treatment, MS Contin, but it made him itchy with some rash so he stopped taking it. (Tr. 182, 183.) Dr. Song continued to prescribe Vicodin throughout the period that he treated Brown, but beginning in September 2007 he advised Brown to limit the Vicodin to three tablets per day. (*See* Tr. 180, 186, 188.) It appears that Brown complied, as Dr. Song continued to prescribe 90 tablets of Vicodin without refills each month. (*See, e.g.*, Tr. 240.) Brown told Dr. Song in June 2009 that "without this medication, he is unable to function." (Tr. 240.) In August 2008 Dr. Song wrote to

---

disk" denotes a particular type of herniated disk, although in non-standard use it may be used to denote a change in disk shape that has not ruptured the exterior covering of the disk. *See* American Society of Neuroradiology et al., Glossary, *Nomenclature and Classification of Lumbar Disc Pathology* (Feb. 2003), http://www.asnr.org/spine_nomenclature/glossary.shtml .

Dr. Upfall: "I told him that just prescribing pain medication is not a solution . . . . [Y]ou requested that I continue to take care of Mr. Brown's back pain. Therefore, I had no choice but to prescribe Vicodin ES #90 tablets. I emphasized to Mr. Brown not to take more than three per day. [] There is not a great deal more that I can do for Mr. Brown at this time." (Tr. 180.)

Dr. Song repeatedly recommended steroid injections in the sacroiliac joint, but Brown repeatedly refused; Dr. Song said at one point that Brown was "afraid that if anything happens that he cannot take care of his children" (Tr. 189), and later that it was "due to needle fear" (Tr. 186). Brown finally did undergo a steroid injection in February 2009, but he told Dr. Song that it relieved his pain for only a few days. (Tr. 243.) In December 2009, however, Dr. Song wrote: "I may consider a sacroiliac joint injection at his next visit, if this is approved; he states the sacroiliac joint injection had helped for approximately three months in the past." (Tr. 236.) And in March 2010, Dr. Song wrote, "[t]he last sacroiliac joint injection on the left, given on January 18, 2010 relieved pain for approximately two weeks, but pain did return." (Tr. 283.)

Dr. Song told Brown in November 2007 "that he may not be indicated for surgical intervention for his back pain at this time." (Tr. 186.) But in June 2009 and again in January 2010, Dr. Song recommended that Brown see a spine surgeon to be evaluated. (Tr. 241–42, 283.) The referral was not approved by Brown's insurance company. (Tr. 283.)

Brown complained of stiffness, swelling, and pain in his knees, especially the left, to Dr. Song in October and November 2009 (Tr. 237–38) and to Dr. Upfall in October 2009 (Tr. 264). He was also experiencing pain in his ankles, left wrist, and right thumb. (Tr. 237, 239, 241, 265.) Dr. Song wrote that Brown had "polyarthritis and arthralgia, most likely secondary to

6

osteoarthritis." (Tr. 237.) He prescribed Feldene, an anti-inflammatory effective in treating rheumatoid arthritis and osteoarthritis (*see* U.S. National Library of Medicine, National Institutes of Health, Drug Information Portal, http://druginfo.nlm.nih.gov/drugportal/ (last updated Sept. 2013)), and gave Brown a cortisone injection in the left knee in December 2009. (Tr. 236.) An x-ray of Brown's left knee on June 1, 2010, revealed osteoarthritic changes. (Tr. 289.)

On October 25, 2008, E. Montasir, M.D., examined and evaluated Brown at the request of Michigan's Disability Determination Services ("DDS"), a state agency that helps the Social Security Administration evaluate disability claimants in Michigan. (Tr. 199.) Dr. Montasir reported that Brown had "normal gait and stance," "good handgrip," "[s]ensory functions intact to sharp and dull gross testing," "fair muscle tone without flaccidity, spasticity or paralysis," and "managed to squat 25% of the distance," "do tandem walk," and "get on and off the examination table without difficulties." (Tr. 200.) He concluded that "[b]ased upon today's exam, the claimant is able to work six to eight hours daily," "in a seated or standing position," with "[s]tanding . . . limited to about two hours at a time." (Tr. 201.) He reported: "the patient has limitation on walking, usually two to three blocks or so or a good half hour at a time, but the "upper extremities are satisfactory and there is no limitation to range of motion, ability to lift, carry or push." *Id.* According to Dr. Montasir, Brown "should be able to push, pull, lift and carry ten to fifteen pounds at a time frequently reasonably well." *Id.* Brown did have "limitation on climbing ropes, ladders and scaffolding secondary to his chronic back problem," but "climbing stairs should be no problem except the frequency." *Id.* Brown's "[f]ine and gross dexterity [wa]s intact," with "no evidence of atrophy or sensory changes." *Id.*

7

Regarding Brown's osteoarthritis and spinal disorder, Dr. Montasir wrote: "The patient has no subluxation, contracture or instability but chronic pain and stiffness in the lower back and this has its limitations, however no joint deformity or subluxation. No sensory or motor reflex findings. No circulatory deficits. No atrophy. The grip and pinch strength was excellent bilaterally." *Id.* He noted that Brown "had a straight leg raising of 60 degrees on the right side and 65 degrees on the left side in the lying position, sitting position was about 40 degrees bilaterally." *Id.* Dr. Montasir also indicated that Brown "ambulates reasonably well without any ambulation aid," although he "had borrowed a cane from his brother." *Id.*

DDS consultant Dr. William Joh completed a physical RFC assessment for Brown on December 5, 2008, based on a review of his records. (Tr. 225–32.) Dr. Joh indicated that there was no new medical evidence of record and he was adopting the RFC from the prior ALJ decision. (Tr. 226.) He provided the following limitations: Brown could occasionally lift or carry up to 50 pounds and frequently lift up to 25 pounds; stand or walk up to six hours and sit up to six hours without breaks in an eight-hour workday; occasionally climb ramps, stairs, ladders, rope, or scaffolds; and occasionally stoop, kneel, or crawl. (Tr. 226–27.)

Dr. Upfall completed a physical RFC questionnaire on March 8, 2010. (Tr. 278–81.) Dr. Upfall provided that his questionnaire responses applied as early as 2005. (Tr. 281.) He opined that Brown would likely be absent from work more than four days per month as a result of impairments or treatment. (Tr. 281.) When asked to estimate Brown's functional limitations in a competitive work situation, Dr. Upfall indicated that Brown could not walk a single city block without rest or severe pain, could sit no more than five minutes before needing to get up and

8

stand no more than five minutes before needing to sit or walk, and could sit less than two hours and stand or walk less than two hours in an eight-hour workday. (Tr. 279.) He provided that Brown required a job that would permit shifting positions at will and taking unscheduled breaks "often," and specifically that Brown would need to walk around for two minutes every five minutes. (Tr. 280.) Brown's ability to lift and carry was limited to less than 10 pounds "rarely," and 10 pounds or more "never," according to Dr. Upfall. (*Id.*) Dr. Upfall also indicated that Brown could "never" twist, stoop, crouch or squat, climb ladders, or climb stairs. (*Id.*) But Dr. Upfall indicated no limitations in reaching, handling, fingering, grasping, and manipulation with the arms, hands, and fingers. (Tr. 281.)

On April 20, 2010, Brown was examined by Kalyan Kosuri, M.D., and Abdulgadir Adam, M.D., at the Pulmonary/Critical Care and Sleep Medicine Division of Wayne State University's School of Medicine. (Tr. 285–87.) The doctors diagnosed asthma, and recommended that Brown be evaluated for sleep apnea. (Tr. 287.)

### 2. Mental Impairments

Dr. Upfall noted depression and anxiety on July 17, 2007, and referred Brown to a psychiatrist. (Tr. 172.) Dr. Upfall's examination notes, which contain little detail, also indicated that Brown was experiencing stress and anxiety in December 2007, depression in January, September, and October 2009, and depression and anxiety in January 2010. (Tr. 162, 260, 264, 265, 276.) Dr. Upfall prescribed Zoloft in September 2009, and increased the dose in January 2010. (Tr. 260, 265.)

As noted above, Dr. Upfall completed a physical RFC questionnaire on March 8, 2010,

9

which indicated that his responses applied as early as 2005. (Tr. 278–81.) When asked to indicate how often during a typical workday Brown's "experience of pain or other symptoms" would be "severe enough to interfere with attention and concentration needed to perform even simple work tasks," Dr. Upfall marked "constantly." (Tr. 279.) He opined that Brown was "[i]ncapable of even 'low stress' jobs." (Tr. 279.)

Brown sought treatment for depression at Insight Recovery Center in December 2007. (*See* Tr. 149–52.) The intake therapist diagnosed depression, noting mild manifestations of avoiding gaze, memory confabulation, being overly cooperative, depressed affect, lack of social and personal judgment, loose associations in thought process, and unrealistically low self concept, but no hallucinations, delusions, insight problems, homicidal or suicidal ideation or plan. (Tr. 154–55.) The therapist recommended weekly individual outpatient therapy for one year. (Tr. 155.) It is not clear whether Brown pursued that recommendation. The only other record from Insight Recovery Center is a May 5, 2008 psychiatric evaluation by psychiatrist Michael Gotlib, diagnosing Major Depression and prescribing Wellbutrin. (Tr. 146.)

Dr. Atul C. Shah, a DDS consultant, conducted a psychiatric evaluation of Brown on October 25, 2008. (Tr. 195–197.) He concluded: "Based upon today's evaluation, the patient has moderate to severe mental and functional impairment such as interaction with the public and also family members and concentration and attention and memory problems, which may hamper his performance of his occupational duty at this time." (Tr. 197.) Dr. Shah diagnosed major depressive disorder, recurrent in partial remission, and assessed a Global Assessment of

Functioning ("GAF") score of 60.[10] (*Id.*) He noted "poor motivation and low self-esteem," "a tendency to minimize symptoms," "a snappy and frustrated mood," depressed and anxious reactions, and blunt affect, but "good contact with reality," fair insight, and no hallucinations, paranoia, gross delusions, or mood swings. (Tr. 196.) Brown told Dr. Shah that he has suicidal thoughts but wants to live for his children. (*Id.*) In memory tests, Brown was able to recall three digits out of five forwards and two out of five backwards, and two out of three objects after a few minutes. (*Id.*) He performed basic calculations slowly but correctly. (*Id.*) He also responded slowly but correctly when asked to name famous people, and named only three large cities when asked to name five. (*Id.*) He responded "I don't know" to each question when asked to interpret proverbs and explain the difference between a bush and a tree. (*Id.*)

DDS consulting psychiatrist Kokila Sheth completed a mental RFC assessment and a "Psychiatric Review Technique" on November 5, 2008, based on a review of Brown's records. (Tr. 207–10, 211–24.) Dr. Sheth indicated that Brown was moderately limited in five functional areas: ability to understand and remember directions, ability to maintain attention and concentration for extended periods, ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without

---

[10] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV")*, 30–34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32. A GAF score of 51 to 60 reflects "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

an unreasonable number and length of rest periods, ability to accept instructions and respond appropriately to criticism from supervisors, and ability to respond appropriately to changes in the work setting. (Tr. 207–208.) She concluded: "he retains mental RFC to do simple unskilled work on sust[a]in[ed] basis with adequ[a]te pace and end[u]r[a]nce." (Tr. 209.)

### C. Administrative Hearing

#### 1. Plaintiff's Testimony

At the July 7, 2010 hearing before ALJ Blum, Brown testified that he was unable to work due to pain in his "lower back, around [the] hip area." (Tr. 16.) He said he also had a bad knee that would affect his ability to work. (Tr. 20.) He said it felt unstable and it "gave out" at least once. (Tr. 20–21.) Brown was also limited by depression, he said; he received medication from his primary doctor for moodiness and lack of appetite. (Tr. 21–22.) When the ALJ asked Brown about his asthma, he testified that it did not limit him as long as he treated it twice a day. (Tr. 21.)

Brown said he could not stand more than about 15 minutes continuously due to his back pain (Tr. 17), and the pain would flare up after sitting about 30 minutes to an hour (Tr. 18). He could walk for "maybe a block," "but it's kind of slow." (*Id.*) He said he used a cane that was prescribed. (Tr. 18, 23–24.)

When ALJ Blum asked Brown whether he could do chores around the house, Brown said he could not cut grass or remove snow, but he could set the table and push a vacuum. (Tr. 17–18.) He thought he could lift eight to ten pounds. (Tr. 19–20.) He sometimes drove a car. (Tr. 25.) Brown testified that he cared for his five children, without assistance from their mother,

12

who lived in another state. (Tr. 25.)

When asked how bad the pain got, Brown said "about a seven or eight." (Tr . 18.) When it got that bad, he would take some pain medication and "lay down maybe for a half hour or so." (*Id.*) On average he would need to do that at least twice a day. (*Id.*) The medication reduced his pain to "about a five or a six." (Tr. 24.) In a one-week period, he typically had three good days and four bad days. (Tr. 19.) On a good day he could "stand a little longer" and "pull up a chair and start repairing some stuff like . . . doorknobs and stuff around the house." (*Id.*) On a bad day, he said: "It'll be hard. My back will be hurting and the pain would throw me totally off and I would have to take breaks and stuff like that." (*Id.*)

ALJ Blum asked Brown whether he could work six hours—"say, at a table, assembling small parts that weighed a pound or less"—if he could stand or sit at will. (Tr. 24.) Brown responded: "Not with the pain that comes and go[es]," even with medication. (*Id.*)

### 2. The Vocational Expert's Testimony

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations approximating Plaintiff's. The ALJ asked the VE to review the consultative examination report by Dr. Montasir. (Tr. 27–28.) The VE noted that the report "says 6 to 8 hours," and assumed that since "he can do eight, then it's full-time work." (Tr. 28.) Based on Dr. Montasir's report, the VE assumed that Plaintiff could do a limited range of light work with the option to sit or stand and the ability to lift only up to 15 pounds. (Tr. 27–29.) The VE testified that there were jobs available for a hypothetical individual in that category "that are assembly, packaging, inspection and sorting," but "if it's full light, it

13

would be up to 20 pounds," and "[i]n this case, it's up to only 15 pounds, so it would be a narrower range of those." (Tr. 29.) The VE testified that there would be 8,000 such jobs available in Michigan and 100,000 nationwide. (Tr. 29.)

The ALJ also asked the VE about job availability for the same hypothetical individual except that the individual could lift only ten pounds; the VE said 10,000 jobs would be available in Michigan, 5,000 in southeast Michigan, and 100,000 nationwide. (Tr. 32–33.)

When the ALJ asked the VE to assume a hypothetical individual with the degree, intensity, and chronicity of pain in the back and knee represented in Plaintiff's testimony, the VE testified that all full time work would be precluded for such an individual because "he finds it necessary to be recumbent half an hour . . . at least two times per day," which "would not be tolerated in the workplace, day in and day out." (Tr. 31; *see also* Tr. 33.) In addition, the VE said, based on Brown's testimony that he has four bad days per week, "he has to take more breaks than usual" and "[a]n employer would not tolerate that level of pacing with the presumption being that it would interfere with his ability to meet productivity standards." (Tr. 31.)

The VE noted that her testimony departed from the Dictionary of Occupational Titles ("DOT") in that the DOT did not include a sit or stand option and did not address light jobs limited to lifting less than 20 pounds—"[i]t does not give you that specificity"—and the DOT was 20 years old and outdated. (Tr. 30, 33.) She stated that her "awareness of those occupations" was based on her work experience and "familiarity with the market." (Tr. 30, 33.)

14

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. § 416.920.

15

"The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Blum found that Plaintiff had not engaged in substantial gainful activity since July 18, 2008, the application date. (Tr. 47.) At step two, he found that Plaintiff had the following medically determinable impairments: broad right paracentral protrusion of lumbar disc with nerve root impingement, osteoarthritis in the left knee, asthma, and major depressive disorder. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 47–49.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to "perform light work as defined in 20 CFR 416.967(b) except that he can lift or carry 10–15 pounds frequently and requires an option to sit or stand, and that he is limited to performing simple, unskilled work." (Tr. 49.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 53.) At step five, the ALJ relied on vocational expert testimony to find that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 54–55.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision. (Tr. 55.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision

16

pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512–13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss

17

every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

### A.  Step Three

Plaintiff raises  several errors in the ALJ's step three analysis. First, Plaintiff argues that the ALJ erred by failing to elaborate on his conclusion that the listing criteria for disorders of the spine (Listing 1.04) were not met or equaled. (Pl.'s Mot. Summ. J. at 9–11.) Plaintiff argues that the error is not harmless because "it is certainly reasonable to conclude that [the] evidence *could* meet Listing 1.04(A)." (Pl.'s Mot. Summ. J. at 10.) Plaintiff also argues that the ALJ erred by failing to rely upon an up-to-date opinion from a medical expert on the issue of listing equivalence. (*Id.* at 11–13.) The Commissioner argues that any failure by the ALJ to articulate his findings at step three should be deemed harmless. (Def.'s Mot. Summ. J. at 12–13.) In response to Plaintiff's argument that there was no up-to-date opinion on equivalence on which the ALJ could rely, the Commissioner argues that Dr. Joh's recommendation that a prior ALJ decision be adopted should suffice. (*Id.* at 13–16.)

At step three, the ALJ "must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 (6th Cir. 2011). In *Reynolds*, the Sixth Circuit found that the ALJ erred because "[n]o analysis

18

whatsoever was done as to whether Reynolds' physical impairments (all summed up in his finding of a severe "back pain" impairment) met or equaled a Listing under section 1.00, despite his introduction concluding that they did not." *Id.* The Court further concluded that "correction of such an error is not merely a formalistic matter of procedure, for it is possible that the evidence Reynolds put forth could meet this listing." *Id.* Thus "the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Id.* at 416.

That is not to say that an ALJ's failure to articulate a step three finding may never be deemed harmless. Where "concrete factual and medical evidence" is "apparent in the record" such that a court can discern how the ALJ "would have" reasoned, the outcome should be affirmed. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 656–57 (6th Cir. 2009); *see also M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 860 (E.D. Mich. 2012)  (discussing case law). But in performing this analysis, the Court must exercise caution. The Court may not find the ALJ's procedural error harmless merely because substantial evidence exists in the record that could uphold the ALJ's decision. *See M.G.*, 861 F. Supp. 2d at 860. In *Rabbers v. Commissioner of Social Security*, the Sixth Circuit warned that it may be difficult or impossible to determine whether an error is harmless when the record contains "conflicting or inconclusive evidence" not resolved by the ALJ or "evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider." 582 F.3d at 657–68. The Court cannot speculate as to how the ALJ might have weighed such evidence. *See M.G.*, 861 F. Supp. 2d at 860–61.

At step three, ALJ Blum made the following finding: "Considered individually and in combination, the claimant's physical impairments do not meet or medically equal a listing. The undersigned reached this finding after consideration of all the listed impairments, specifically Listings l.04 and 3.03." (Tr. 47.) The ALJ went on to consider whether Brown's mental impairments met the criteria of Listing 12.04, without providing any further analysis of Listings 1.04 and 3.03.

Listing 1.04 is for "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Part 404, Subpart P, Appendix 1, at § 1.04. There are three alternative methods of meeting the listing. Plaintiff argues that he could meet the requirements outlined in § 1.04(A): "Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *Id.* Regarding motor loss, the SSA further provides: "Inability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss." 20 C.F.R. Part 404, Subpart P, Appendix 1, at § 1.00(E). Comparing these criteria to the medical evidence, as the ALJ should have done, the Court finds that Brown could not have met the requirements of Listing 1.04(A).

Brown had evidence of nerve root compression in the August 17, 2007 MRI of his

20

lumbar spine, fulfilling the first part of Listing 1.04(A). (Tr. 290.) But the root compression must be "characterized by . . . motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss." The Commissioner argues that "Plaintiff mentions no evidence showing motor loss," "Dr. Montasir noted no motor abnormalities and Dr. Song indicated on many occasions that Plaintiff had no motor problems (Tr. 180-81, 186-87, 190, 193, 201)," and although "Plaintiff did walk with a cane (Tr. 19)," "there was no indication that he believed he needed it due to weakness, as opposed to some other reason, such as pain relief." (Def.'s Mot. Summ. J. at 13.) Indeed, Dr. Song repeatedly indicated that Brown had normal motor function (Tr. 180, 181, 186, 190, 193) and no muscle weakness (Tr. 187, 191). Dr. Montasir reported "[n]o sensory or motor reflex findings," "[n]o atrophy," and "grip and pinch strength was excellent." (Tr. 201.) The Court could not locate any evidence in Brown's medical records of muscle weakness or atrophy, or inability to walk on heels or toes, squat, or rise from a squatting position, and Plaintiff has not identified any. Plaintiff emphasizes Brown's positive straight-leg tests and evidence of reduced range of motion. (*See* Mot. at 10.) But the listing requirements are conjunctive; there must be evidence of limited motion *and* motor loss *and* positive straight-leg raising tests. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, at § 1.04(a). Absent evidence of motor loss, the evidence of limited motion and positive straight-leg raising tests will not suffice. Brown could not meet the criteria of Listing 1.04(a).

But that finding does not complete the step three analysis. When a claimant has a listed impairment but does not meet the criteria, an ALJ can find that the impairment is "medically equivalent" to the listing if the claimant has "other findings related to [the] impairment that are

at least of equal medical significance to the required criteria." 20 C.F.R. § 416.926(a). The SSA requires that the "judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." Social Security Ruling ("SSR") 96-6p, 1996 WL 374180 at *3 (1996);[11] *see also* 20 C.F.R. § 416.926(c) ("We also consider the opinion given by one or more medical or psychological consultants designated by the Commissioner."); *Retka v. Comm'r of Soc. Sec.*, 70 F.3d 1272 (6th Cir. 1995) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made."); *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *4 (E.D. Mich. Sep. 25, 2013) (remanding because there was no expert medical opinion on the issue of equivalence, collecting cases) ; *Manson v. Comm'r of Soc. Sec.*, No. 12-11473, 2013 WL 3456960, at *11 (E.D. Mich. July 9, 2013)  (remanding for an expert opinion at step three). SSA guidance provides that a "Disability Determination and Transmittal" form signed by a medical or psychological consultant, a "Psychiatric Review Technique" form, "and various other documents on which medical and psychological consultants may record their findings," can fulfill this requirement to "ensure that this opinion has been obtained at the first two levels of administrative review." *See* SSR 96-6p, 1996 WL 374180 at *3.

The administrative record in this case includes a Disability Determination and Transmittal that refers to a November 5, 2008, Mental RFC form completed by DDS consultant

---

[11] Social Security Rulings are "binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1); *Heckler v. Edwards*, 465 US 870, 873 n.3 (1984).

Dr. Sheth. (Tr. 75, 207–10.) Dr. Sheth also completed a Psychiatric Review Technique on November 5, 2008. (Tr. 211–24.) Dr. Sheth's medical specialty was psychiatry. (*See* Tr. 75; Program Operations Manual System (POMS) DI 26510.090(D), *available at* http://policy.ssa.gov/poms.nsf/lnx/0426510090 (last updated Aug. 29, 2012).) The Mental RFC form and Psychiatric Review Technique expressly addressed only Listing 12.04. (Tr. 207221.) Dr. Sheth checked a box in the Psychiatric Review Assessment indicating: "Coexisting Nonmental Impairment(s) that Requires Referral to Another Medical Specialty." (Tr. 211.) Dr. Sheth's opinions cannot support a conclusion that Brown's impairments were not equivalent to Listing 1.04. *Cf. Byerley v. Colvin*, No. 12-CV-91, 2013 WL 2145596, at *11 (N.D. Ind. May 14, 2013) ("Because the psychologist who prepared the form did not consider physical impairments, it cannot be relied on as expert opinion that Plaintiff's combination of physical and mental impairments do not equal a Listing."); *Watson v. Massanari*, No. 00-3621, 2001 WL 1160036, at *14 (E.D. Pa. Sept. 6, 2001) (remanding "so that the ALJ can enlist the services of a medical expert capable of making an equivalency finding as to Plaintiff's impairments *in combination*," where the expert opinions on equivalence in the record expressly addressed only the claimant's physical impairments).

The parties do not address whether Dr. Sheth's opinion might suffice. Instead, they focus on a December 2008 "Case Analysis" form completed by William Joh, M.D, which contains only one sentence: "No new mer, ALJ's adopted." (Tr. 234.) Dr. Joh also completed a Physical RFC Assessment in December 2008, in which he also stated "No new mer, ALJ's adopted." (Tr. 226.) Neither form mentions equivalence or any of the listings. Defendant notes that in the prior

23

ALJ decision, in June 2008, "an ALJ found that . . . the record did not contain a medical source who made 'findings equivalent in severity to the criteria of any listed impairment' (Tr. 72)." (Def.'s Mot. Summ. J. at 14.) Thus, Defendant concludes, "Dr. Joh's December 2008 statement was a document that insured that a physician considered the question of equivalence, as required by the Ruling." (*Id.*)

Defendant does not point to any evidence that the record before the ALJ in June 2008 contained an expert opinion on medical equivalence. The ALJ's statement in the June 2008 opinion itself suggests that it did not; the ALJ instead made a negative inference based on a lack of any finding of equivalence in the record. (*See* Tr. 72.) That does not fulfill SSR 96-6's requirement that an opinion on equivalence "be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180 at *3; *see Barnett v. Barnhart*, 381 F.3d 664, 671 (7th Cir. 2004) ("[T]he ALJ simply assumed the absence of equivalency without any relevant discussion. That assumption cannot substitute for evidence and does not support the decision to deny benefits."). Nor does Dr. Joh's opinion expressly address equivalence. (*See* Tr. 226, 234.) In *Barnett v. Barnhart*, several medical experts examined the claimant and offered opinions regarding his RFC, including in a Physical RFC Assessment form, but the Seventh Circuit found that the ALJ erred at step three because none of those doctors specifically opined equivalence. *See Barnett*, 381 F.3d at 667, 670–71. Similarly here, Dr. Joh's opinion does not satisfy SSR 96-6p. The Court therefore need not reach Plaintiff's argument that the ALJ erred by failing to update that opinion.

In this case, the lack of an expert opinion on equivalence with respect to Listing 1.04 is

not harmless error. As discussed above, Brown met most of the requirements for Listing 1.04(a): he has evidence of nerve root compression, limited motion, and a positive straight-leg raising test. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, at § 1.04(a). The only criterion he could not fulfill was motor loss. But motor loss can be shown by "inability to squat," and Dr. Montasir noted that Brown could squat only "25% of the distance." (*See* Tr. 200.) Because an expert could have found that Brown's impairments were equivalent to the listing, the ALJ's failure to consult an expert was not harmless.

The Court finds that the record does not contain an expert opinion on equivalence that could support a finding that Brown's impairments were not equal in severity to Listing 1.04(a), as required by SSR 96-6p. *See Barnett*, 381 F.3d at 667, 671. The ALJ's finding that the listing was not equaled is therefore not supported by substantial evidence. *See Reynolds*, 424 F. App'x at 416.

### B.  Dr. Montasir

Plaintiff argues that the ALJ erred by giving significant weight to the opinion of consultative examiner Dr. Montasir although he did not have access to the entire case record, including the August 2007 MRI, and by failing to adequately explain his weighting of Dr. Montasir's opinion. (Pl.'s Mot. Summ. J. at 15.) The Commissioner responds that "[t]he ALJ noted that Dr. Montasir did not have Plaintiff's 2007 lumbar spine MRI, but concluded that his opinion did account for Plaintiff's spine abnormalities observed on examination, specifically, Plaintiff's reduced ranges of lumbar spine motion." (Def.'s Mot. Summ. J. at 19.)

The ALJ noted that Dr. Montasir "was told 'that [Brown] has some disc prolapse in the

lumbar region." (Tr. 51.) He concluded: "The undersigned gives Dr. Montasir's opinion significant weight. While Dr. Montasir's examination did not have the aid of reference to the claimant's August 17, 2007 MRI revealing the prolapsed lumbar disc, his opinion does account for the range of motion limitations in the claimant's lower back that he directly observed." (Tr. 52.) Supportability and consistency with the record as a whole are among the factors that an ALJ must weigh when considering a medical opinion. 20 C.F.R. § 416.927(d). Dr. Montasir's opinion was not inconsistent with the record as a whole; he knew about the MRI and what it showed, although he did not have the MRI itself. (*See* Tr. 199.) The ALJ noted these facts when he weighed the doctor's opinion. The Court agrees with the Commissioner that the ALJ properly accounted for the fact that Dr. Montasir did not have access to the MRI when he weighed Dr. Montasir's opinion. The Court will not second-guess the ALJ's decision to give the opinion significant weight.

Plaintiff also argues that the ALJ failed to account for Dr. Montasir's opinion that Plaintiff was "able to work six to eight hours daily." (Pl.'s Mot. Summ. J. at 16.) Plaintiff argues that the Commissioner's reliance on the vocational expert's testimony was error because the VE "ha[d] to '*assume*' on her own initiative that the hypothetical individual could perform eight hours per day." (*Id.* at 17, emphasis in original.) The Commissioner argues that the VE and ALJ both understood Dr. Montasir's opinion to mean that Plaintiff could work "as long as eight hours a day, which could constitute full time work," and the ALJ was therefore entitled to rely on the VE's testimony. (Def.'s Mot. Summ. J. at 20.) It is certainly possible that Dr. Montasir meant that Brown could work only six hours on some days, but it is also possible that Dr. Montasir

26

meant he could work up to eight hours every day. Where an ALJ's finding falls within the "zone of choice" within which a decisionmaker can go either way, the courts will not overturn it. *See Mullen*, 800 F.2d at 545. The Court finds no error in the ALJ's consideration of Dr. Montasir's opinion.

### C.  Dr. Upfall

Plaintiff argues that the ALJ violated the treating source rule by failing to accord controlling weight to the opinion of Dr. Upfall. (Pl.'s Mot. Summ. J. at 17–19.) The Commissioner responds that "[g]iven the absence of any significant findings in Dr. Upfall's notes, the ALJ reasonably concluded that her extremely restrictive opinion was unsupported." (Def.'s Mot. Summ. J. at 17.) Plaintiff also argues that the ALJ failed to set forth good reasons for rejecting Dr. Upfall's opinion, as required by the treating source rule, because the ALJ referenced only two specific treatment notes, neglecting notes that span over two years and failing "to consider that Dr. Upfall had the benefit of consulting with Dr. Song and reviewing Plaintiff's MRI." (Pl.'s Mot. Summ. J. at 19.) The Commissioner argues that "it was reasonable for the ALJ to specifically mention those treatment notes, because they were the two treatment notes closest in time to Dr. Upfall's March 2010 opinion," and moreover, "Dr. Upfall recorded the same findings in every treatment note since September 2006." (Def.'s Mot. Summ. J. at 18.) The Commissioner also dismisses Dr. Upfall's alleged collaboration with Dr. Song: "While Dr. Song did write a number of letters to Dr. Upfall regarding Plaintiff's treatment, there is no significant evidence of 'collaboration' . . . . Rather, it appears that Dr. Upfall simply left treatment of Plaintiff's back condition to Dr. Song." (*Id.*)

27

As the Sixth Circuit recently re-emphasized, "[a]s a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source') . . . and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source')." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). The opinion of a treating physician, in particular, is the subject of a special rule: such an opinion must be given controlling weight if it is well-supported and not inconsistent with the record, and even if it is not given controlling weight, it is subject to a rebuttable presumption of deference. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 242; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). When a treating source opinion is not given controlling weight, the factors in 20 C.F.R. § 416.927(c) must be applied to determine how much weight to assign the opinion. *See* 20 C.F.R. § 416.927(c); *Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544. The factors to be applied are: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the supportability of the treating-source opinion, (4) the "consistency of the opinion with the record as a whole," (5) "the specialization of the treating source," and (6) any other factors "which tend to support or contradict the opinion." 20 C.F.R. § 416.927(c).

Here, the ALJ "accorded less weight" to the opinion of Dr. Upfall. (Tr. 52.) He noted that "Dr. Upfall has enjoyed a long history of treating the claimant, from as early as September 2006

through February 2010," but concluded, "full review of Dr. Upfall's office treatment notes show somewhat fluctuating impressions as to the claimant's impairments, which generally echo the claimant's symptoms and which do not appear to be any product of Dr. Upfall's own clinical observations or physical examination findings." (Tr. 52.) The ALJ also noted that Dr. Upfall found that Brown "had 'good' musculoskeletal range of motion, normal reflexes, no edema, and lungs clear to auscultation" on March 5, 2010, and February 22, 2010. (*Id.*) The ALJ juxtaposed these findings with Dr. Upfall's March 8, 2010 questionnaire answers, in which Dr. Upfall opined—as summarized by the ALJ—that Brown "could sit, stand and walk each for less than 2 hours in an 8 hour day; that the claimant would require frequent unscheduled rest breaks; and must shift positions at will from sitting or standing," and "would have 'bad days' that would cause him to be absent from work more than 4 days each month." (*Id.*) The ALJ also "accord[ed] minimal weight to [Dr. Upfall's] most restrictive opinion of the claimant's mental functioning, as it lacks support of documented findings from the volume of Dr. Upfall's treatment notes." (Tr. 53.) In particular, the ALJ noted that Brown "has not been hospitalized for his depression and has been prescribed conservatively with medications." (*Id.*) The ALJ chose to adopt an RFC that was less restrictive than the limitations indicated in Dr. Upfall's March 8, 2010 questionnaire answers, reasoning:

> Given all the factors analyzed in this case, including but not limited to the claimant's diminished credibility as to the extent of the limiting effects of his impairments when confronted with the objective findings in the record, the opinion of the consultative physical examiner, Dr. Montasir, and the opinion of the State Agency psychological consultant, the preponderance of the evidence supports a finding that the claimant can perform a range

29

> of light work with the additional exertional limitations set forth
> above.

(Tr. 53.)

This is not a case in which the ALJ failed to set forth "good reasons" for the weight

assigned to a treating-source opinion. *See Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 243;

*Wilson*, 378 F.3d at 544; SSR 96-2p, 1996 WL 374188, at *5 (1996). ALJ Blum provided

analysis of Dr. Upfall's opinion and treatment record that touched on several of the factors

identified in 20 C.F.R. § 416.927(c), including the length of the treatment relationship, the

supportability of the opinion, and its consistency with the record as a whole. The treating source

rule does not require "an exhaustive factor-by-factor analysis"; it is enough if the ALJ's decision

permits "a clear understanding of the reasons for the weight given." *Francis v. Comm'r Soc. Sec.

Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011). The ALJ's reasons for the weight given to Dr.

Upfall's opinion are sufficiently specific to permit this Court's review. *See* SSR 96-2p, 1996 WL

374188, at *5.

And substantial evidence supports the reasons given. The Court has reviewed Dr.

Upfall's treatment records, and agrees with ALJ Blum that the limited and mostly normal

clinical observations and examination findings therein are not consistent with the restrictive RFC

recommended in Dr. Upfall's March 8, 2010 questionnaire answers. Although the ALJ did not

discuss whether and how Dr. Song's findings and treatment record—to which, it appears, Dr.

Upfall had access—might support Dr. Upfall's opinion, it is clear from other parts of the

decision that the ALJ reviewed and considered Dr. Song's records. In particular, the ALJ noted

that Dr. Song's records "exhibit the claimant's admission that the Vicodin allows him to function

30

and that steroid injections relieve his pain for durations from two weeks up to three months, thus evincing that intervening treatments for the claimant's back pain control to an appreciable degree the extent of his pain." (Tr. 50.) Moreover, on this Court's review, the clinical findings in Dr. Song's records are no more consistent with Dr. Upfall's restrictive RFC than Dr. Upfall's own treatment records; although Dr. Song noted, on a couple occasions, "limited motion" (Tr. 187, 237), he also repeatedly found "normal motor function" (*see* Tr. 180–94, 236–44, 283). Thus even if, as Plaintiff argues, the "ALJ fail[ed] to consider that Dr. Upfall had the benefit of consulting with Dr. Song," nothing in Dr. Song's records is so inconsistent with the ALJ's decision as to compel remand.

Nor is it especially compelling that Dr. Upfall "had the benefit of . . . reviewing Plaintiff's MRI." (Pl.'s Mot. Summ. J. at 19.) The MRI merely established that Brown had a disc protrusion with nerve root impingement (Tr. 290), which the ALJ found was a severe impairment for Brown (Tr. 47). The MRI provided no information about the functional effects of that impairment. And Dr. Montasir, whom the ALJ accorded great weight in formulating the RFC, knew about the MRI and what it showed, although he did not review it himself. (*See* Tr. 199.) Plaintiff's heavy emphasis on the MRI is misplaced.

It is certainly possible that Dr. Upfall's questionnaire answers appear inconsistent with his treatment records only because the detailed functional analysis elicited by the questionnaire reflects a different emphasis than what Dr. Upfall typically recorded in examination and treatment notes. Another ALJ might have chosen to trust the doctor's judgment on the basis of his long-term treating relationship, despite the lack of longitudinal documentation. But ALJ

31

Blum's more skeptical take is not unreasonable. When substantial evidence supports an ALJ's decision, a court must affirm even if it would have decided differently, *see Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam), and even if substantial evidence also supports the opposite conclusion, *see Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc). The ALJ's decision to accord less weight to Dr. Upfall's opinion than to Dr. Montasir's and Dr. Sheth's does not require remand.

### D. Credibility

Plaintiff argues that the ALJ's evaluation of his credibility was erroneous because it "failed to set forth sufficiently specific reasons as to why he found Plaintiff's testimony and statements not credible," "fail[ed] to rationalize the conflict of accepting some of Plaintiff's statements and discrediting others," and "d[id] not point to any medical evidence in the record that indicates Plaintiff is not credible in connection with his subjective complaints and limitations." (Pl.'s Mot. Summ. J. at 13–14.) The Commissioner argues that the ALJ "provided specific, well-founded reasons for his credibility determination." (Def.'s Mot. Summ. J. at 21.)

ALJ Blum found that although Brown's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 50.) He went on to discuss how Brown's treatment history and clinical and diagnostic findings support the RFC, and how "the medical signs and findings are somewhat inconsistent with his allegations of debilitating pain." (Tr. 50.) In particular, the ALJ noted that Brown is not considering spinal

32

surgery, that according to Dr. Song, Vicodin allows Brown to function and steroid injections "relieve his pain for durations from two weeks up to three months," that Brown's testimony that he was prescribed a cane is not substantiated by the record, and that according to Dr. Song, "the knee effusion was 'almost totally gone' despite persisting pain." (Tr. 50.) The ALJ also stated with respect to Brown's mental impairment that "the record reveals largely conservative treatment and absence of any follow up therapy," and went on to discuss the evidence in detail. (*See* Tr. 51.)

This is not a case in which the ALJ used boilerplate language "without linking the conclusory statements contained therein to evidence in the record or even tailoring the paragraph to the facts at hand," as in the Seventh Circuit case that Plaintiff relies on. *See Bjornson v. Astrue*, 671 F.3d 640, 644–45 (7th Cir. 2012). Nor did the ALJ fail to discuss his reasoning, or offer explanations that were not consistent with the record. *Cf. Rogers*, 486 F.3d at 248.

Nor is Plaintiff's argument that the ALJ "fail[ed] to rationalize the conflict of accepting some of Plaintiff's statements and discrediting others" persuasive. The regulations specifically contemplate that a claimant will be found partially credible, providing that the Agency will "determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence. . . ." 20 C.F.R. § 416.929(a). Similarly, the Sixth Circuit has stated: "Discounting credibility *to a certain degree* is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (emphasis added). As Defendant aptly explained:

33

> A credibility determination is not an assessment of whether a claimant is generally a truthful person. Rather it is an evaluation of a claimant's statements regarding the intensity, persistence, and functionally limiting effects of his impairments. 20 C.F.R. § 416.929(c)(4); Social Security Ruling 96-7p.Therefore, the ALJ could believe that Plaintiff was as active as he claimed and still determine that he exaggerated the intensity, persistence, and functionally limiting effects of his impairments.

(Def.'s Mot. Summ. J. at 22.)

In sum, ALJ Blum's findings regarding Brown's credibility are adequately explained and supported by substantial evidence, and the Court will not disturb them. *See Walters*, 127 F. 3d at 531 ("[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.").

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, the Court finds that substantial evidence does not support the Administrative Law Judge's finding that Brown's impairments were not equal in severity to the Commissioner's listing criteria for spinal disorders. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 11) be granted in part, that Defendant's Motion for Summary Judgment (Dkt. 15) be denied, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REVERSED AND REMANDED to adequately address the issue of medical equivalence.

34

**VI. FILING OBJECTIONS**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," et cetera. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise  response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," et cetera. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: November 18, 2013                                  s/Laurie J. Michelson
                                                          United States Magistrate Judge

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on November 18, 2013.


s/Jane Johnson
Deputy Clerk

36